## A. GALLO AND COMPANY ET AL. *v.* GINA MCCARTHY, COMMISSIONER OF ENVIRONMENTAL PROTECTION, ET AL.

Superior Court, Judicial District of Hartford
File No. CV-09-4043592-S

Memorandum filed April 23, 2010

*James K. Robertson, Jr.,* and *David S. Hardy,* for the plaintiffs.

*Richard Blumenthal,* attorney general, and *Robert W. Clark,* assistant attorney general, for the defendants.

*Garrett S. Flynn, Patricia A. Millett,* pro hac vice, and *Kevin R. Amer,* pro hac vice, for the American Beverage Association as amicus curiae.

DOMNARSKI, J. In this action, the plaintiffs seek declaratory relief and money damages. The plaintiffs claim that certain provisions of Public Acts 2009, No. 09-1 (P.A. 09-1), effected a retroactive taking of their property in violation of the fifth and fourteenth amendments to the United States constitution and article first, § 11, of the constitution of Connecticut. The property at issue is unclaimed beverage container deposits. The plaintiffs have moved for summary judgment on liability, and the defendants have filed a cross motion for summary judgment. Additionally, the American Beverage Association has filed an amicus brief in support of the plaintiffs' motion and in opposition to the defendants' cross motion.

The plaintiffs initially sought a temporary injunction prohibiting the defendants from enforcing certain portions of P.A. 09-1. See *A. Gallo & Co.* v. *McCarthy,* Superior Court, judicial district of Hartford, Docket No. CV-09-4043592-S (May 5, 2009) (*Aurigemma, J.*). At the hearing on the temporary injunction, before Judge Aurigemma, the parties jointly submitted a proposed finding of facts that were not in dispute. The application for the temporary injunction was denied. Id. The parties have asked this court to rely on the facts contained in the ruling on the temporary injunction. Accordingly,

Judge Aurigemma's thorough discussion of the stipulated facts, which are set forth as follows.

I

## FACTS FROM RULING ON APPLICATION FOR TEMPORARY INJUNCTION

"The plaintiffs, A. Gallo & Company, Allan S. Goodman, Inc., Dichello Distributors, Inc., Dwan & Company, Inc., F&F Distributors, Inc., Franklin Distributors, Inc., G&G Beverage Distributors, Inc., Hartford Distributors, Inc., Levine Distributing Company, Inc., Northeast Beverage Corporation of Connecticut and Star Distributors, Inc., are Connecticut corporations and at all relevant times were distributors of beer in the state of Connecticut. The plaintiff Pepsi Cola Newburgh Bottling Company, Inc., is a New York corporation and at all relevant times was a distributor of soft drinks in the state of Connecticut.

"The defendant Gina McCarthy is the commissioner of the department of environmental protection (department). Commissioner McCarthy and the department are charged with administering and enforcing General Statutes § 22a-243 et seq., as amended by Public Acts [2008, No. 08-1 (P.A. 08-1)], and P.A. 09-1, and McCarthy is responsible for depositing the payment appropriated thereby in the state's general fund.

"The state is facing a significant economic crisis. On January 20, 2009, the [defendant Governor M. Jodi Rell][1] announced that the estimated budget deficit for the current fiscal year ending June 30, 2009, was at nearly $922 million. On April 20, 2009, the governor announced that the 2009 budget deficit had increased to approximately $1.056 billion and that the estimated budget deficit for the next two fiscal years combined was $7.95

---

[1] Attorney General Richard Blumenthal also is a defendant in this action.

billion. To reduce the 2009 deficit, the governor submitted, and the legislature passed, a number of deficit mitigation plans, including P.A. 08-1 and P.A. 09-1. In addition, the governor sought state employee concessions, state agency budget rescissions, instituted a ban on state travel and nonessential purchasing by state agencies, and instituted a hiring freeze.

"[Public Acts 1978, No. 78-16], effective January 1, 1980, codified as § 22a-243 et seq., is commonly known as the 'Bottle Bill.' In an effort to reduce litter and solid waste levels, the Bottle Bill established a system of beverage container recycling to be administered, in part, by Connecticut's beer and soft drink distributors such as the plaintiffs. The Bottle Bill required the plaintiffs to pay a five cent refund value upon the return of empty beer or soft drink containers of the kind, size and brand sold by the distributor.

"Under the provisions of the Bottle Bill and Connecticut's long-standing and highly regulated three tier alcoholic beverage distribution system (distributor-retailer-consumer), the basic mechanics of the return and refund process function as follows:

"a. Beverage distributors such as the plaintiff[s] 'initiate,' or charge and collect, a five cent refund value on each container sold to a retailer;

"b. Retailers pay the five cent refund value on each container purchased from the distributor, and, in turn, charge and collect a five cent refund value from the end-purchaser-consumer of the beverage;

"c. If a consumer returns the empty container to the retailer (or a redemption center), the retailer (or redemption center) is required to pay the consumer a refund of five cents; and

"d. The retailer (or redemption center), in turn, will return the empty container to the distributor of the

product, who must reimburse the retailer (or redemption center) five cents.

"The plaintiffs also incur costs and expense administering portions of the Bottle Bill, including:

"a. Paying a one and one-half cent statutory handling fee to the retailer (or redemption center) for each empty beer container returned. In the case of soft drinks, the statutory handling fee for the return of empty containers is two cents;

"b. Transporting empty containers from the retailer back to the distributor;

"c. Providing dedicated space for processing returns;

"d. Making arrangements for the processing and recycling of the empty containers; and

"e. Incurring the costs of labor, overhead and insurance necessary to perform these functions and to comply with the mandates of the Bottle Bill.

"After paying the refund value and the handling fee, the distributors own the returned containers, which are recyclable materials, and may dispose of them as they choose. Distributors may sell returns to third parties. The costs of performing the tasks described in the preceeding paragraph are borne by the Connecticut beverage distributors like the plaintiffs.

"Under the Bottle Bill, distributors do not hold refund values in a manner that makes them identifiable to a specific container or a specific consumer. The plaintiffs have a statutory obligation to pay retailers five cents when presented with an empty container of the kind, size and brand sold by the plaintiffs, regardless of when the container was actually sold to a retailer or consumer. The Bottle Bill does not refer to the amounts paid by a distributor to retailers upon the return of an empty container of the kind, size and brand sold by the

distributor as a 'deposit.' Instead, the Bottle Bill defines such payments as 'refund values.'

"On November 25, 2008, the legislature passed [P.A.] 08-1, entitled 'An Act Concerning Deficit Mitigation' [2008 Deficit Mitigation Act]. [The 2008 Deficit Mitigation Act] required each of the plaintiff distributors to 'open a special interest-bearing account at a Connecticut branch of a financial institution, as defined in section 45a-557a of the general statutes, to the credit of the deposit initiator.' P.A. 08-1, § 11 (a). The 2008 Deficit Mitigation Act further provided that '[e]ach deposit initiator shall deposit in such account an amount equal to the refund value established pursuant to subsection (a) of section 22a-244 of the general statutes, for each beverage container sold by such deposit initiator.' Id. '[F]or any beverage container sold during the period from December 1, 2008, to December 31, 2008, inclusive, such deposit shall be made not later than January 5, 2009.' Id. All interest, dividends and returns earned on the special account were required to be paid into such account and such moneys were required to 'be kept separate and apart from all other moneys in the possession of the deposit initiator.' Id. [Last], the 2008 Deficit Mitigation Act provided that '[a]ny reimbursement of the refund value for a redeemed beverage container shall be paid from the deposit initiator's special account.' " Id., § 11 (b).

"One of the purposes of the 2008 Deficit Mitigation Act was to provide the state and [the department] with information concerning the container return rate and the amount of money representing the difference between refund values deposited and paid. The [department] published a document on its [Internet site] entitled 'bottle Bill FAQ.' On January 5, 2009, [the department] edited the web page by changing the name of the person at [the department] to whom public inquiries could be made about the subject matter of the web

page. The updated information provided in pertinent part:[2]

"Who gets the money from bottles that are not returned?

"Called unclaimed deposits, these monies accumulate from containers that are either thrown away, or recycled through curbside programs. These fund[s] are kept by the distributors.

"Beginning on December 1, 2008, the plaintiffs began opening and funding accounts in accordance with the terms of the 2008 Deficit Mitigation Act. On or before March 15, 2009, the plaintiffs were required to submit reports on their account activity for the period December 1, 2008, through February 28, 2009, to the [the department] in accordance with the 2008 Deficit Mitigation Act.

"On January 15, 2009, the legislature passed, and the governor signed, [P.A.] 09-1, entitled 'An Act Concerning Deficit Mitigation for the Fiscal Year Ending June 30, 2009.' Section 15 of P.A. 09-1, the section relevant to this case, provides that it is '[e]ffective April 1, 2009, and applicable to periods commencing on or after December 1, 2008 . . . .' [P.A. 09-1, § 15.] [P.A. 09-1, § 15] requires the plaintiffs to pay to the [department] (for deposit in the state's general fund), not later than April 30, 2009, the balances in the plaintiffs' special accounts that are attributable to [the] period December 1, 2008, through March 31, 2009, and further requires additional quarterly payments from the special accounts on an ongoing basis.

"In accordance with § 15 (c) of P.A. 09-1, twenty-four distributors submitted financial reports to [the department] for the period December 1, 2008, to February

[2] "The defendants have not stipulated that this change was made in response to [P.A.] Act 08-1." *A. Gallo & Co.* v. *McCarthy,* supra, Superior Court, Docket No. CV-09-4043592-S (*Aurigemma, J.*).

28, 2009. Of the twenty-four companies that submitted financial reports for the period December 1, 2008, to February 28, 2009, thirteen provided information about the statutory 'handling fees' they incurred for that period.

"The Bottle Bill does not require the plaintiffs to charge retailers a five cent refund value at the time of sale and neither expressly prohibits nor permits the plaintiffs to specifically itemize the five cent refund value on their invoices, and some distributors, including some of the plaintiffs, choose to incorporate this amount into the purchase price of beverages they sell to retailers without itemizing it. The Bottle Bill neither expressly prohibits nor permits the distributors from including the five cent refund value in the general revenues that they calculate on their financial statements. The plaintiffs have included said refund value amounts in their general revenues for accounting purposes.

"The Bottle Bill neither expressly prohibits nor permits distributors from including the refund values they collect as revenues for purposes of calculating their income taxes. Nor does the Bottle Bill expressly prohibit or permit distributors from deducting redemption amounts they pay as expenses when calculating their income taxes. Under P.A. 08-1, sums deposited in the special accounts are determined by a formula, i.e., number of containers sold [multiplied by] five cents.

"Through March 31, 2009, the plaintiffs maintained in their names special interest bearing accounts at Connecticut branches of financial institutions, as defined in General Statutes § [45a-557a], to the credit of the plaintiffs and maintained transactional authority over the accounts. Pursuant to § 11 (a) and (b) of P.A. 08-1, moneys deposited into the special accounts 'shall be kept separate and apart from all other moneys in the

possession of the deposit initiator,' and '[a]ny reimbursement of the refund value for a redeemed beverage container shall be paid from the deposit initiator's special account.' The Bottle Bill never dictated to the plaintiffs what amounts they may charge for their products." *A. Gallo & Co.* v. *McCarthy*, supra, Superior Court, Docket No. CV-09-4043592-S (*Aurigemma, J.*).

For purposes of this motion, the plaintiffs do not claim a property interest in the unclaimed deposit balances that accrued after April 1, 2009, the effective date of P.A. 09-1, § 15, hereinafter referred to as the 2009 Act. Following the denial of their motion for a temporary injunction, the plaintiffs paid the unclaimed beverage container refund values, with accrued interest, attributable to the period of December 1, 2008, through March 31, 2009, to the state. It appears from exhibit one of the plaintiffs' motion for summary judgment that the total amount paid by the twelve plaintiffs is $2,058,651.67.

II

DISCUSSION

"Summary judgment is a method of resolving litigation when pleadings, affidavits, and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Wilson* v. *New Haven*, 213 Conn. 277, 279, 567 A.2d 829 (1989). The plaintiffs seek summary judgment on the ground that the retroactive provision of the 2009 Act constitutes an unconstitutional taking of their property. Therefore, they seek a return of the amounts that they have paid to the state pursuant to that provision. In their cross motion for summary judgment, the defendants assert that there was no taking because the plaintiffs never had a vested property interest in the unclaimed deposit balances. In the alternative, the defendants argue that even if the

plaintiffs had any contingent rights to the surpluses in the special accounts, such rights were extinguished on January 15, 2009, the date that the 2009 Act was enacted.

"The fifth amendment to the United States constitution, which is applicable to the states through the fourteenth amendment; see *Phillips* v. *Washington Legal Foundation*, 524 U.S. 156, 163–64, 118 S. Ct. 1925, 141 L. Ed. 2d 174 (1998); provides in relevant part that 'private property [shall not] be taken for public use, without just compensation.' Article first, § 11, of the Connecticut constitution provides that '[t]he property of no person shall be taken for public use, without just compensation therefor.' " *Darien* v. *Estate of D'Addario*, 258 Conn. 663, 665 n.3, 784 A.2d 337 (2001).

"The party attacking a validly enacted statute . . . bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt . . . ." *State* v. *Breton*, 212 Conn. 258, 269, 562 A.2d 1060 (1989); *Zapata* v. *Burns*, 207 Conn. 496, 508, 542 A.2d 700 (1988). The court must "indulge in every presumption in favor of the statute's constitutionality," and, when called on to interpret a statute, the court must search for "an effective and constitutional construction that reasonably accords with the legislature's underlying intent." *State* v. *Breton*, supra, 269; see also *State* v. *Floyd*, 217 Conn. 73, 79, 584 A.2d 1157 (1991); see *McConnell* v. *Beverly Enterprises-Connecticut, Inc.*, 209 Conn. 692, 705–706, 553 A.2d 596 (1989).

A

Do Plaintiffs Have Property Interest in Balances in Special Accounts Attributable to Period December 1, 2008, through March 31, 2009?

The plaintiffs argue that the money that accrued in the special accounts during the period of December 1, 2008, through March 31, 2009, representing unclaimed

refund values, is their property. Thus, they argue that the requirement that these funds be paid to the state constitutes an unconstitutional taking. The defendants counter that the state never took property from the plaintiffs because they never had a vested property interest in the money in the special accounts.

Resolution of this issue first requires an examination of the original Bottle Bill and P.A. 08-1, § 11, hereafter referred to as the 2008 Act. As noted previously, under the original Bottle Bill, the distributors did not hold refund values or deposits[3] in a manner that made them identifiable to a specific container or a specific consumer. The bill imposed on the distributors the obligation to pay a five cent refund upon the return of an empty container. In essence, the distributors' obligation to pay refund values on the return container is an expense of doing business, which was paid from the income they received from the sale of filled beverage containers to the retailers. Therefore, this court concludes that under the original Bottle Bill, the unclaimed deposits were the property of the distributors.

Although the plaintiffs' claims present a question of first impression in Connecticut, a similar issue with respect to unclaimed bottle deposits arose in *Massachusetts Wholesalers of Malt Beverages, Inc.* v. *Attorney General*, 409 Mass. 336, 341–42, 567 N.E.2d 183 (1991) (*Massachusetts Wholesalers I*). In that case, the Massachusetts Supreme Judicial Court construed a similar container deposit bill, which required distributors to segregate deposits and handling charges into a separate account and to pay refunds from this separate account. Id., 337. One of the issues before the court was whether the distributors held the deposits in trust for consumers. Id., 338. The court concluded that even though the state

---

[3] In their briefs, the parties refer to "refund values" and "deposits" interchangeably, and the court will do the same."

could validly require the distributors to segregate the deposit funds, the unclaimed deposits belonged to the distributors. Id., 339.

The court reasoned that under the statute, the concept of a consumer "deposit" for each purchased container was a legal fiction. It observed: "Notably, the law does not require dealers to pass those deposits along to bottlers or distributors or in any way to 'deposit' refund values with bottlers or distributors. The dealer's only obligation is to pay consumers for empties. . . . Indeed, for all that appears, the usual course is that bottlers and distributors receive payment for the beverage containers they sell before the dealers receive the consumers' deposits in conjunction with consumer purchases. Thus, the 'deposits' that bottlers and distributors 'receive,' within the contemplation of [the bottle bill], cannot be identified with, or viewed as originating from, the deposits made by consumers. The 'deposits and/or handling charges' can only be viewed as a portion of the purchase price of filled containers paid by dealers to distributors and by distributors to bottlers. Presumably, the money contemplated by the [l]egislature as constituting 'deposits and/or handling charges' is simply a percentage of that purchase price that would be enough to enable the bottlers and distributors to meet their statutory obligation to pay the refund value of beverage containers returned to them." (Citations omitted.) Id., 341–42.

The court also found that the legislature did not intend that unredeemed deposits should escheat to the state. Id., 342. The court relied, inter alia, on the fact that the bill was silent with respect to the disposition of the balance in the special accounts. "The absence of legislative direction, expressed or implied, leads to the fair inference that the unclaimed deposits belong to the bottlers and distributors." (Internal quotation marks omitted.) Id.; see also *Michigan Soft Drink Assn.*

v. *Dept. of Treasury*, 206 Mich. App. 392, 397, 522 N.W.2d 643 (1994) ("[i]n the absence of any explicit legislative directive, manufacturers and distributors kept all the unredeemed deposits"), leave to appeal denied, 448 Mich. 898, 533 N.W.2d 313 (1995).

The analysis in *Massachusetts Wholesalers I* of the property rights created by the Massachusetts bottle bill is helpful here because that bill, like Connecticut's, imposed a liability or obligation on the distributors to pay a refund value for the return containers from the revenue or income that they received from the sale of the filled containers to the retailers. Therefore, the unclaimed deposits were, in actuality, a portion of the revenue received by the distributors from the sale of their products. These unclaimed deposits were the property of the distributors in the same away as any income over and above operating expenses would be the property of distributors. As in Connecticut, Massachusetts' original bottle bill did not make the deposits identifiable to a specific container, and it made no provision for ownership of the deposits. Although the accrued unclaimed deposits were property that resulted from a consequence of operations under the original bottle bill, that fact did not make the unclaimed deposits someone else's property. Moreover, as described previously, Connecticut's original Bottle Bill did not contain express language or express or implied legislative direction concerning the disposition of the unredeemed deposits.

The defendants here cannot, and do not, seriously contest that prior to the 2008 Act, the unclaimed deposits were the property of the plaintiffs. In fact, the state never made demand of the funds. Instead, the plaintiffs regularly reported these amounts as their revenue. Moreover, as noted previously, the department's Internet site informed the public that with regard to

unclaimed deposits, "these funds are kept by the distributors."

Having concluded that the unclaimed deposits were the plaintiffs' property before the adoption of the 2008 Act, the court must determine what effect the 2008 Act had on the plaintiffs' property interest in the unclaimed deposits. The plaintiffs maintain that their property interest in the money held in the special accounts was not affected by the passage of the 2008 Act. The defendants, on the other hand, argue that upon passage of the 2008 Act, the plaintiffs no longer had a property interest in the funds.

The court agrees with the plaintiffs. The 2008 Act required the distributors to establish special accounts that were funded by the refund values for each container sold by the distributors. It provided that the reimbursement of the refund values could be paid from these accounts. The 2008 Act also contained reporting requirements concerning the container return rate and the difference between the refund value and the deposits paid back to consumers.

The 2008 Act is significant for what it did not establish. The 2008 Act did not indicate a legislative intent to place the ownership of refund values in the consumer or in the state. Specifically, the 2008 Act made no provision for the ultimate disposition of the money in the special accounts. Although the 2008 Act did require the establishment of the special accounts, funded from the plaintiffs' operations, its primary purpose was to facilitate the reporting of the container return rate and the amounts of unclaimed deposits.

This conclusion is supported by the legislative history. For instance, the testimony of Representative Cameron C. Staples reveals that the 2008 Act was passed as a method for the state to gather information about how much money may be raised through unredeemed

deposits: "The other portion of the bill is—relates to the unclaimed bottle deposits. The bill requires, for the first time that those receipts be accounted for, and be declared publicly on a quarterly basis to the State Department of Environmental Protection. One of the difficulties in determining whether we should collect that revenue is that we don't have any way of measuring what the revenue will be. The estimates that are in the various fiscal notes really are based on our guesses based on out-of-state receipts. And there are no registered records here in the state of the uncollected deposits. So, the bill before us would require that. And the first report of those deposits would be available to us on March 15, of 2009, in time for us to evaluate next session how much revenue is coming to the distributors and allow us to evaluate whether or not we ought to recapture some or all of the revenue on an ongoing basis." 51 H.R. Proc., Pt. 23, November, 2008 Spec. Sess., pp. 7417–18. Likewise, Senator Jonathan A. Harris later testified in the January, 2009 session that "it was the intent of this legislature, when passing [the 2008 Act], to get these reports so that we can understand the entire cost structure of the bottle deposit system." 52 S. Proc., Pt. 2, 2009 Sess., p. 409.

Despite the legislative history, the defendants argue that the restrictions placed on the accounts by the 2008 Act extinguished any interest that the plaintiffs had in the unclaimed deposits. As support, they cite *Carr* v. *Bridgewater*, 224 Conn. 44, 616 A.2d 257 (1992), for the proposition that "in order to have a protected property right, [one] must have a clear entitlement to the [property interest]." (Internal quotation marks omitted.) Id., 51. The thrust of the defendants' argument is that the plaintiffs' claimed property interest in the money held in the accounts does not merit constitutional protection. The defendants minimize the obvious: "Money is certainly property . . . ." *Pirie* v. *Chicago Title &*

*Trust Co.*, 182 U.S. 438, 443, 21 S. Ct. 906, 45 L. Ed. 1171 (1901). As such, it may not be taken without appropriate compensation. *Northeastern Gas Transmission Co.* v. *Collins*, 138 Conn. 582, 587, 87 A.2d 139 (1952) ("private property shall not be taken for public use without just compensation"). The cases relied on by the defendants to show that the plaintiffs do not have a vested or present interest are inapplicable. Those cases involve rights that concerned interests other than money held in accounts that were established by the owner of such money. See, e.g., *State* v. *State Employees' Review Board*, 239 Conn. 638, 653, 687 A.2d 134 (1997) (employee did not have vested rights in particular job classification); *Trumbull* v. *Ehrsam*, 148 Conn. 47, 56, 166 A.2d 844 (1961) (landowner did not suffer taking by virtue of abandoned condemnation proceedings); *Bryant* v. *Hackett*, 118 Conn. 233, 247, 171 A. 664 (1934) (whether as result of trust agreement, no one "had more than an expectancy and there were no persons with vested rights to the property"); *Bishop* v. *New Haven*, 82 Conn. 51, 57–58, 72 A. 646 (1909) (resolution by city, where owner retains possession, not a taking).

The fact that the legislature required the plaintiffs to deposit their moneys, which represented the refund values of the containers sold by the plaintiffs and were derived from the plaintiffs' operations, did not strip the plaintiffs of their property interest in that money. This conclusion is supported by *Brown* v. *Legal Foundation of Washington*, 538 U.S. 216, 223–24, 123 S. Ct. 1406, 155 L. Ed. 2d 376 (2003). In *Brown*, the Rules of Professional Conduct, which were amended by the Washington Supreme Court, required the plaintiffs to place their money in an interest on lawyers' trust account (IOLTA) where interest on the account was paid over to the Legal Foundation of Washington (foundation). The plaintiffs claimed, in part, that the requirement that client funds be placed in an IOLTA account constituted an illegal

taking from them of the beneficial use of those funds. Id., 220. The court disagreed and stated: "In their complaint, [the plaintiffs] separately challenge (1) the requirement that their funds must be placed in an IOLTA account (Count III) and (2) the later transfers to the [f]oundation of whatever interest is thereafter earned (Count II). *The former is merely a transfer of principal and therefore does not effect a confiscation of any interest.*" (Emphasis added.) Id., 234.

Just as the *Brown* plaintiffs did not lose their beneficial interest in their money merely because it was placed in a mandatory IOLTA account, the plaintiffs here did not lose their beneficial interest in their money simply because it was placed in the special accounts, pursuant to the 2008 Act.

As mentioned previously, although the 2008 Act contained restrictions on the plaintiffs' use of the money placed in the special accounts, it made no provision for the disposition of any moneys that remained in the accounts after the reimbursement of refund values for returned containers. The plaintiffs and the defendants acknowledge that the disposition of the remaining money would be determined by future legislation. This fact, however, did not make the plaintiffs' interest in the account balances contingent. As noted previously, the plaintiffs' property interest was already established when they deposited their money into the accounts.

Although the legislature did subsequently enact the 2009 Act, which effectively escheated the account balances to the state, it certainly had the authority to release the balances, as of March 31, 2009, to the distributors. In actuality, the 2008 Act mandated that the distributors place money that they owned into restricted special accounts for an undetermined, but temporary, period of time. This action did not lessen the plaintiffs' property rights as to the balances in the accounts for

the period in question, nor create rights in the state. See *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U.S. 155, 164, 101 S. Ct. 446, 66 L. Ed. 2d 358 (1980) (a fund owned by others does not become public money because it is held temporarily by a court). Accordingly, the passage of the 2008 Act did not affect the plaintiffs' property interest in, and to, the balances in the special accounts for the period in question.

B

What is Effect of P.A. 09-1 on Balances in Special Accounts for Period December 1, 2008, through March 31, 2009?

The 2009 Act restated the provisions of the 2008 Act, and, in addition, contained a provision that mandated that deposit initiators, including the plaintiffs, pay the balances, representing the unclaimed refund values held in the special accounts, to the department for deposit in the state's general fund. The balances attributable to the period from December 1, 2008, through March 31, 2009, were to be paid on or before April 30, 2009. The 2009 Act provided that it was "[e]ffective April 1, 2009, and applicable to periods commencing on or after December 1, 2008 . . . ." P.A. 09-1, § 15.

As noted previously, for purposes of this motion, the plaintiffs do not dispute that as a result of the 2009 Act, they no longer had a property interest in the unclaimed deposits that accrued after April 1, 2009. They acknowledge that after this date, the unclaimed deposits that accrued in their special accounts escheated to the state. This court agrees that the 2009 Act extinguished the plaintiffs' rights to any unclaimed bottle deposits that accrued after the act's effective date. As the Supreme Judicial Court of Massachusetts noted, "[w]hat the [l]egislature granted in the original bottle bill, the [l]egislature can take away by amendment." *Massachusetts Wholesalers of Malt Beverages, Inc.* v. *Commonwealth*,

414 Mass. 411, 417, 609 N.E.2d 67 (1993) (*Massachusetts Wholesalers II*).

The crux of the controversy, therefore, is whether the state is entitled to the funds that accrued in the account prior to the 2009 Act's effective date. The 2009 Act, which, for the first time established by law that unclaimed refund values were to be turned over to the department, was passed by the legislature and signed by the governor on January 15, 2009. As mentioned previously, the act provided that it became effective on April 1, 2009, and was applicable to periods commencing on or after December 1, 2008. The plaintiffs maintain that because the effective date was April 1, 2009, the state has no claim to the money that accrued in the special accounts prior to that date. They further argue that the 2009 Act has a retroactive provision that constitutes an unconstitutional taking. On the other hand, the defendants maintain that because the 2009 Act is "applicable" to periods commencing after December 1, 2008, the escheat provision applies to all balances in the accounts that accrued after December 1, 2008. The defendants also maintain that the 2009 Act was not retroactive for all periods prior to April 1, 2009, because it was passed in January. Thus, they assert that April 1, 2009, was not the date that the distributors lost their property interest in the unclaimed deposits. Rather, they argue that this was the date that the distributors could commence making payments to the state because the first accounting period had ended.

"Whether to apply a statute retroactively or prospectively depends upon the intent of the legislature in enacting the statute. . . . In order to determine the legislative intent, we utilize well established rules of statutory construction. Our point of departure is General Statutes § 55-3, which states: No provision of the general statutes, not previously contained in the statutes of the state, which imposes any new obligation on

any person or corporation, shall be construed to have retrospective effect. The obligations referred to in the statute are those of substantive law. . . . Thus, we have uniformly interpreted § 55-3 as a rule of presumed legislative intent that statutes affecting substantive rights shall apply prospectively only. . . . This presumption in favor of prospective applicability, however, may be rebutted when the legislature clearly and unequivocally expresses its intent that the legislation shall apply retrospectively. *In re Daniel H.*, 237 Conn. 364, 372, 678 A.2d 462 (1996); accord *Bayusik* v. *Nationwide Mutual Ins. Co.*, 233 Conn. 474, 483–84, 659 A.2d 1188 (1995); *Miano* v. *Thorne*, 218 Conn. 170, 175, 588 A.2d 189 (1991)." (Citations omitted; internal quotation marks omitted.) *Andersen Consulting, LLP* v. *Gavin*, 255 Conn. 498, 516, 767 A.2d 692 (2001).

For purposes of analyzing the application of the 2009 Act, the most important date is April 1, 2009, its effective date. "A statute takes effect from the date of its passage unless the time is fixed by a constitution or statutory provision, *or is otherwise provided in the statute itself.*" (Emphasis added.) 2 J. Sutherland, Statutory Construction (6th Ed. Singer 2001) § 33:6, p. 15. Here, the 2009 Act specifically provided that the effective date was April 1, 2009. Thus, it gave notice to everyone that as of April 1, 2009, and not before, the unclaimed deposits would escheat to the state. Accordingly, until April 1, 2009, the distributors managed their operations with the knowledge that the unclaimed deposits belonged to them. "The power to enact laws includes the power to fix a future effective date. . . . The purpose of the future effective date is to inform people of the provisions of a statute before it becomes effective so that they may protect their rights and discharge their obligations." Id., § 33:7, pp. 20 and 23.

The defendants' claim that the passage date of January 15, 2009, should be construed as the effective date

ignores the plain language of the 2009 Act. See, e.g., *Neilson* v. *Perkins*, 86 Conn. 425, 428, 85 A. 686 (1913) (court could not ignore plain language of statute, which in "express terms" said when it would take effect). If the legislature desired the 2009 Act to have an earlier effective date, it could have made it effective upon its passage, as it did with the majority of the other sections contained within P.A. 09-1[4] and the 2008 Act. Instead, it fixed a future date. "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Landgraf* v. *USI Film Products*, 511 U.S. 244, 265, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994). While the court can only hypothesize as to why the legislature did not choose to make the 2009 Act effective upon passage, the fact remains that the court is bound by the plain language of the act.

The court does find, however, that the 2009 Act contained a retroactive provision. The primary purpose of the 2009 Act was to establish that balances remaining in the special accounts would be paid over to the state. Consequently, subsection (d ) of § 15 of the 2009 Act states: "On or before April 30, 2009, each deposit initiator shall pay the balance outstanding in the special account that is attributable to the period from December 1, 2008, to March 31, 2009, inclusive, to the [c]ommissioner of [e]nvironmental [p]rotection for deposit in the [g]eneral [f]und. *Thereafter the balance outstanding in the special account that is attributable to the immediately preceding calendar quarter shall be paid by the deposit initiator one month after the close of the quarter to the [c]ommissioner of [e]nvironmental [p]rotection for deposit in the [g]eneral [f]und.*" (Emphasis added.) P.A. 09-1, § 15 (d). The legislature

---

[4] See P.A. 09-1, §§ 1 through 14, 17 through 23, 25 through 31, and 33 and 35 (all effective from passage).

did not change the effective date of the 2009 Act by including language that affected balances that had accumulated prior to April 1, 2009. Instead, by stating that the 2009 Act was applicable to periods commencing on or after December 1, 2008, the legislature expressed its intent that the payover provisions be applied retroactively from the effective date. To be sure, the legislature does have the power to enact retroactive statutes. See, e.g., *Bhinder* v. *Sun Co.*, 263 Conn. 358, 373–74, 819 A.2d 822 (2003) (upholding retroactive legislation). This retroactive application, however, must be constitutionally valid.

## C

### Is Retroactive Portion of 2009 Act Constitutional?

The United States Supreme Court discussed concerns regarding retroactive legislation in *Eastern Enterprises* v. *Apfel*, 524 U.S. 498, 532–34, 118 S. Ct. 2131, 141 L. Ed. 2d 451 (1998): "Retroactivity is generally disfavored in the law . . . in accordance with 'fundamental notions of justice' that have been recognized throughout history . . . . See . . . e.g., *Dash* v. *Van Kleeck*, 7 Johns. *477, *503 ([N.Y.] 1811) ('It is a principle in the English common law, as ancient as the law itself, that a statute, even of its omnipotent parliament, is not to have a retrospective effect'); H. Broom, Legal Maxims 24 (8th ed. 1911) ('Retrospective laws are, as a rule, of questionable policy, and contrary to the general principle that legislation by which the conduct of mankind is to be regulated ought to deal with future acts, and ought not to change the character of past transactions carried on upon the faith of the then existing law'). In his Commentaries on the Constitution, Justice Story reasoned: 'Retrospective laws are, indeed, generally unjust; and, as has been forcibly said, neither accord with sound legislation nor with the fundamental principles of the social compact.' 2 J. Story, Commentaries

on the Constitution § 1398 (5th ed. 1891). . . . 'Retroactive legislation,' we have explained, 'presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions.' . . .

"Our [c]onstitution expresses concern with retroactive laws through several of its provisions, including the [e]x [p]ost [f]acto and [t]akings [c]lauses. . . . In *Calder* v. *Bull*, [3 U.S. 386] 3 Dall. 386 [1 L. Ed. 648] (1798), this [c]ourt held that the [e]x [p]ost [f]acto [c]lause is directed at the retroactivity of penal legislation, while suggesting that the [t]akings [c]lause provides a similar safeguard against retrospective legislation concerning property rights. . . . In [*United States* v.] *Security Industrial Bank*, [459 U.S. 70, 78–79, 103 S. Ct. 407, 74 L. Ed. 2d 235 (1982)] we considered a [t]akings [c]lause challenge to a [b]ankruptcy [c]ode provision permitting debtors to avoid certain liens, possibly including those predating the statute's enactment. We expressed 'substantial doubt whether the retroactive destruction of the appellees' liens . . . comport[ed] with the [f]ifth [a]mendment,' and therefore construed the statute as applying only to lien interests vesting after the legislation took effect. . . . Similar concerns led this [c]ourt to strike down a bankruptcy provision as an unconstitutional taking where it affected substantive rights acquired before the provision was adopted [in] *Louisville Joint Stock Land Bank* v. *Radford*, 295 U.S. 555, 601–602 [55 S. Ct. 854, 79 L. Ed. 1593] (1935)." (Citations omitted.); see also *Serrano* v. *Aetna Ins. Co.*, 233 Conn. 437, 457–58, 664 A.2d 279 (1995) (court expresses similar concerns over retroactive application of statute under state constitution).

Here, the 2009 Act established that after April 1, 2009, the balances in the special accounts would be paid over to the state. As determined previously, until April 1,

2009, the balances in the special accounts belonged to the distributors. By making the 2009 Act retroactive to December 1, 2008, the legislature directed that the distributors' property, their money, their property, be paid over to the state. The defendants remind the court that the 2008 Act and the 2009 Act were formulated and passed at a time when the state was experiencing a severe budget crisis. This court does not contest that the purpose of both acts was to address the state's budget deficit. With this goal, the legislature established a means of determining the amount of unclaimed deposits through the 2008 Act by requiring the distributors to establish the special accounts. Subsequently, through the 2009 Act, the legislature mandated the means by which the unclaimed money would be paid over to the state on an ongoing basis. By including a retroactive provision in the 2009 Act, it is reasonable to assume that the legislature wanted as much money as possible paid over to the state in order to ameliorate the budget crisis. To this end, the actions of the legislature are understandable. In some circumstances the end justifies the means; however, the means may not be unconstitutional. "Financial constraints may not be used to justify the creation or perpetuation of constitutional violations . . . ." *Rufo* v. *Inmates of Suffolk County Jail*, 502 U.S. 367, 392–93, 112 S. Ct. 748, 116 L. Ed. 2d 867 (1992).

The 2009 Act mandated that effective April 1, 2009, the balances in the special accounts would be paid over to the state . Consequently, the 2009 Act extinguished the distributors' rights to keep any balances that accrued after April 1, 2009. By making the 2009 Act retroactive to December 1, 2008, however, the legislature directed that the distributors relinquish rights to the money that had accrued prior to April 1, 2009, to the state. The retroactive portion of the 2009 Act upset the plaintiffs' settled expectations in an obvious way: it

took their property. This taking without compensation violated the plaintiffs' rights under the United States and Connecticut constitutions.

This conclusion is supported by the holding of *Massachusetts Wholesalers II*. In that case, the Massachusetts Supreme Judicial Court reviewed similar efforts by the Massachusetts legislature to take possession of unclaimed bottle bill deposits through retroactive legislation. As noted previously, in *Massachusetts Wholesalers I*, that court held that unclaimed deposits were the property of the distributors. *Massachusetts Wholesalers of Malt Beverages, Inc.* v. *Commonwealth*, supra, 414 Mass. 412. Thereafter, the Massachusetts legislature amended its bottle bill. Id. The amended bottle bill required the distributors to establish a separate account to hold deposits and pay refund values. Id., 412–13. In addition to requiring that unclaimed deposit amounts would escheat to the state, the amendment also included a retroactive funding provision requiring the distributors to make an initial deposit in a "deposit transaction fund" of a sum equal to the refund values collected for the three months before the effective date of the amendment. Id., 414. This provision is similar to the retroactive portion of the 2009 Act because it affects the property rights of the distributors that accrued before the effective date of the act.

The distributors sought a declaratory judgment that the amended bottle bill constituted a taking in violation of the takings clauses of the United States constitution and the Massachusetts declaration of rights. Id. The court noted that while the original bottle bill created property rights in the distributors, the amendment "makes it redundantly clear that these [deposit] rights belong to the consumer and to the [c]ommonwealth and . . . for no purpose [are] . . . to be regarded as income of said bottlers or distributors." (Internal quotation marks omitted.) Id., 417–18. Consequently, the

court found that after the effective date of the amendment, the distributors no longer had a property right in the unclaimed deposits.

With respect to the retroactive provision, however, the court found that it constituted an impermissible taking. Id., 418. The court held that "the bottlers and distributors have a vested interest in any personal assets they deposited into the fund. Furthermore, pursuant to our holding in [*Massachusetts Wholesalers I*], the bottlers and distributors have a similar right to all unclaimed deposits until the effective date of the amendment on January 4, 1990. Therefore, the bottlers and distributors have a vested interest in the amount of their initial deposit in the fund." Id. Thus, the court concluded that "[t]he retroactive funding provision, thus, takes assets, which are the property of the bottlers and distributors, without compensation and is unconstitutional. 'A State, by ipse dixit, may not transform private property into public property without compensation.' *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, [supra, 449 U.S. 164]." *Massachusetts Wholesalers of Malt Beverages, Inc.* v. *Commonwealth*, supra, 414 Mass. 419.

III

REMEDY

As Judge Aurigemma noted in her ruling on the motion for a temporary injunction, "[t]he remedy for a claim of taking pursuant to the fifth and fourteenth amendments to the United States constitution and article first, § 11, of the constitution of the state of Connecticut is just compensation. *Ruckelshaus* v. *Monsanto Co.*, 467 U.S. 986, 1016 [104 S. Ct. 2862, 81 L. Ed. 2d 815] (1984); *Ives* v. *Addison*, 155 Conn. 335, 341, 232 A.2d 311 (1967)." *A. Gallo & Co.* v. *McCarthy*, supra, Superior Court, Docket No. CV-09-4043592-S (*Aurigemma, J.*); see also *Monterey* v. *Del Monte Dunes at Monterey*,

*Ltd.*, 526 U.S. 687, 714–15, 119 S. Ct. 1624, 143 L. Ed. 2d 882 (1999) (taking of property unconstitutional if state does not provide adequate postdeprivation remedy). The plaintiffs have established as a matter of law that the retroactive portion of the 2009 Act effectuated an unconstitutional taking of their property. Accordingly, they are entitled to summary judgment on liability. Judgment may enter in favor of the plaintiffs on the first count of their amended complaint seeking a declaratory judgment. Moreover, the defendants' motion for summary judgment is hereby denied. The parties are to proceed to a hearing in damages to determine the amount of the plaintiffs' compensation damages that are claimed in the second count.