Morgan L. JONES, Francis Anderson, Frank Banasky, Orrie Anderson, Jesse H. Petrich, George Field, Richard Elvers, James Mendes, Al Bruce, Hans Pedersen, Leo Zingmeister, Individually and as Representatives of a Class, Plaintiffs-Appellants,

v.

Ronald REAGAN, President of the United States; Margaret M. Heckler, Secretary of the Department of Health and Human Services; C. Everett Koop, Surgeon General of the United States; and Richard Ashbaugh, Acting Director of the Bureau of Medical Services, Defendants-Appellees.

No. 83–4309.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 6, 1984.

Decided Dec. 4, 1984.

John Merriam, Thomas Geisness, Seattle, Wash., for plaintiffs-appellants.

William J. McIntyre, Asst. Regional Counsel, Health & Human Services, Seattle, Wash., for defendants-appellees.

Before ANDERSON, SKOPIL and BOO-CHEVER, Circuit Judges.

BOOCHEVER, Circuit Judge:

The plaintiffs, a class of merchant seamen who have been declared permanently not fit for duty because of physical ailments or injuries, challenge sections 986 and 988 of the Omnibus Budget Reconciliation Act of 1981, which terminated the seamen's right to free medical care in government facilities. The seamen contend that the termination of care violates equal protection, due process, the separation of powers, contract law and equity. In addition, the seamen argue that the Act's one-year extension of medical care to certain hospitalized seamen establishes an irrational classification in violation of equal protection. The district court granted summary judgment for the government. We affirm.

## FACTS

The facts are uncontested. The plaintiffs are a class of merchant seamen, numbering approximately 5,000, who experienced illness or injury in the course of their duties prior to October 1, 1981, and as a result were declared permanently not fit for duty. Under maritime law, the seamen were entitled to "maintenance and cure" from the owners of their ships. "Maintenance" is a living allowance that permits the seaman to obtain housing and food while he recovers, G. Gilmore & C. Black, *The Law of Admiralty* § 6–12, at 305 (2d ed. 1975); "cure" is payment for medical care, *see Calmar Steamship Corp. v. Taylor*, 303 U.S. 525, 527–28, 58 S.Ct. 651, 652–53, 82 L.Ed. 993 (1938).

Since 1798, the federal government has provided free medical care for such seamen in hospitals and clinics operated in recent times by the Public Health Service. Admiralty courts routinely have taken judicial notice of the free medical care and have denied awards against the shipowners for medical services available at government expense. *See Calmar Steamship*, 303 U.S. at 531, 58 S.Ct. at 654 and cases cited.

In 1981, Congress enacted the Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, 95 Stat. 357 (1981) (hereinafter the "Budget Act"), a comprehensive appropriations bill that adjusted the eligibility requirements and amounts budgeted for a large number of federal programs. Among its other provisions, the Budget Act ordered the closure and transfer to nonfederal control of the Public Health hospitals and clinics. Section 986 of the Act terminated the right of outpatient seamen to obtain free medical care in the facilities after October 1, 1981, while section 988 allowed continued free care for a maximum of one additional year for inpatient seamen hospitalized prior to October 1. *Id.* §§ 986, 988, 95 Stat. at 603, 604.

## DISCUSSION

### I. Separation of Powers

The seamen contend that the Budget Act unconstitutionally usurps judicial powers in two ways. First, the Act frustrates remedies previously granted to seamen because the courts, in making awards to them, re-

lied on the government's continued provision of free medical care, and laches now bars action against shipowners. Second, the Act legislates beyond congressional admiralty jurisdiction.

### A. Frustration of Judicial Remedies

The seamen assume that closure of the Public Health facilities leaves them without a remedy against the shipowners because of laches. Whether laches would bar relief against individual shipowners is not squarely before this court because the seamen have not brought suit against any of the owners, and the owners have not intervened. Consequently, for purposes of this action, we need only determine whether, as the seamen argue, laches automatically must bar relief against the owners as a matter of law. The seamen cite no authority for the applicability of laches. Their assumption, however, underlies the entire constitutional attack on the Budget Act, and therefore warrants close examination.

Courts typically use an analogous state statute of limitations as a guide to the running of laches in admiralty cases. G. Gilmore & C. Black, *The Law of Admiralty* § 9–79, at 768–69 (2d ed. 1975). The equities of the parties on the facts of each case, however, must be considered as well. Where the delay is excusable and there has been no prejudice to the other party, mere passage of time poses no bar to relief. *Gardner v. Panama R. Co.*, 342 U.S. 29, 31, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951) (per curiam). Some courts balance the inexcusability of delay against prejudice. "A weak excuse might suffice if there has been no prejudice; an exceedingly good one might still do even when there has been some." *Larios v. Victory Carriers, Inc.*, 316 F.2d 63, 67 (2d Cir.1963); *see also Fidelity & Casualty Co. of New York v. C/B Mr. Kim*, 345 F.2d 45, 50 (5th Cir. 1965).

Although we do not decide the issue, we suspect that Congress' termination of the seamen's long-standing free medical care would qualify as an "exceedingly good" excuse for the seamen's delay in suing the shipowners. In *Gardner, supra,* a somewhat similar congressional amendment of a law tolled laches. The plaintiff in *Gardner* was injured by the Panama Railroad, and filed a timely suit against the United States under the Federal Tort Claims Act. While the suit awaited trial, however, Congress amended the Act to exclude government liability for the railroad's negligent acts. In response, plaintiff immediately filed an *in personam* libel against the railroad, this time ten months after the running of the analogous statute of limitations. The Court held that laches did not bar plaintiff's action against the railroad because her delay was caused by Congress, not by her own fault. *Gardner,* 342 U.S. at 31, 72 S.Ct. at 13.

In addition, the passage of time in the instant case may have caused the shipowners little prejudice because the facts necessary to the seamen's claims for "cure" in most cases already have been established. At oral argument, counsel for the seamen conceded that virtually all of the class members were awarded maintenance allowances from the shipowners some time ago. The same facts establish the seamen's rights to cure. For both allowances, the seamen must prove that their illness or injury occurred while they were "within the service of the vessel" or answerable to the call of duty. 1B *Benedict on Admiralty* § 42, at 4–7, § 43 at 4–9, 4–10 (7th ed. 1983); *see also Farrell v. United States,* 336 U.S. 511, 516, 69 S.Ct. 707, 709, 93 L.Ed. 850 (1949).

Other courts have allowed actions for maintenance and cure to proceed in a variety of analogous situations despite substantial delays, where the delay was excusable or little prejudice to the defendant resulted. *See, e.g., Sobosle v. United States Steel Corp.,* 359 F.2d 7, 12 (3d Cir.1966) (laches not automatically a bar where plaintiff's nine-year refusal of treatment was not voluntary); *Fidelity & Casualty Co. of New York v. C/B Mr. Kim,* 345 F.2d at 51–52 (ten-month delay excusable where defendant knew of the injury from the beginning); *Taylor v. Crain,* 195 F.2d 163, 165 (3d

Cir.1952) (delay of 5 years justified where ship's captain promised plaintiff continued employment if he did not sue and threatened to have him blacklisted if he did); *Loverich v. Warner Co.,* 118 F.2d 690, 693 (3d Cir.), *cert. denied,* 313 U.S. 577, 61 S.Ct. 1104, 85 L.Ed. 1535 (1941) (no prejudice despite thirteen-year delay because medical records still available and no other evidence relevant).

Further, the cases suggest that the owner maintains an ongoing responsibility to provide maintenance and cure despite the government's provision of free medical care. If the owner, for example, discovers that a seaman is not receiving proper care at a public facility the owner is obligated to pay for his treatment elsewhere. 1B *Benedict on Admiralty* § 49, at 4–47 (7th ed. 1983); *see also Kratzer v. Capital Marine Supply, Inc.,* 645 F.2d 477, 482 (5th Cir. 1981) (seaman entitled to private care where Public Health Service Hospital was unsuccessful in treating back injury); *Keiser v. American President Lines, Ltd.,* 384 F.Supp. 554 (S.D.N.Y.1974) (shipowner required to reimburse seaman for private medical care where Public Health Service failed to diagnose seaman's injury); *Williams v. United States,* 133 F.Supp. 319 (E.D.Va.), *aff'd,* 228 F.2d 129 (4th Cir.1955), *cert. denied,* 351 U.S. 986, 76 S.Ct. 1054, 100 L.Ed. 1499 (1956) (owner would be responsible for moving seaman to different mental hospital if he were notified that care at state facility was inadequate; dictum); *cf. Diaz v. Gulf Oil Corp.,* 237 F.Supp. 261 (S.D.N.Y.1965) (where Public Health Service hospital too far away, seaman entitled to emergency private hospitalization).

These authorities undercut any facile assumption that laches would preclude action against the shipowners as a matter of law. Laches may in fact bar certain actions, but not merely because of the passage of time. The issue is heavily fact-dependent and should be decided in individual suits against the owners. For purposes of the instant action, we merely hold that the Budget Act does not unconstitutionally invade the province of the judiciary by undoing remedies previously granted to the seamen.

### B. *Article III Limitation*

■ The seamen contend that U.S. Const. art. III, § 2 limits Congress' power to impair the seamen's historic right to maintenance and cure. Article III, section 2 provides in relevant part: "The judicial Power shall extend ... to all Cases of admiralty and maritime jurisdiction; ..." Plaintiffs appear to reason that because federal courts define the scope of admiralty jurisdiction, *see, e.g., Crowell v. Benson,* 285 U.S. 22, 55, 52 S.Ct. 285, 294, 76 L.Ed. 598 (1931); *The Lottawanna,* 88 U.S. (21 Wall.) 558, 575–76, 22 L.Ed. 654 (1874); *Sound Marine & Machine Corp. v. Westchester County,* 100 F.2d 360, 361 (2d Cir. 1938), *cert. denied,* 306 U.S. 642, 59 S.Ct. 582, 83 L.Ed. 1042 (1939), the courts also define the substance of admiralty law, and Congress is powerless to alter the law so defined.

This simply confuses jurisdiction with substance. The decisions actually make clear that Congress may alter the substance of ancient admiralty law. *See, e.g., The Lottawanna,* 88 U.S. (21 Wall.) at 577 ("It cannot be supposed that the framers of the Constitution contemplated that the law should forever remain unalterable. Congress undoubtedly has authority under the commercial power, if no other, to introduce such changes as are likely to be needed."); *Reed v. Canfield,* 20 F.Cas. 426, 427 (C.C. D.Mass.1832) (No. 11,641) ("So far as any act of congress has changed or modified the principle of maritime law, [the ancient maritime law] is to be deemed, pro tanto, repealed; so far as it stands unaffected by any such legislation, it is to be followed out to all its just results."). Congress did not exceed its admiralty jurisdiction by terminating the seamen's free medical care.

### II. Equal Protection

The seamen contend that Congress' termination of free medical care violates equal protection. As a preliminary matter, the

seamen contend that this court should strictly scrutinize the Budget Act because (1) seamen are a suspect classification for purposes of constitutional review and (2) the right to medical care is "fundamental." At a minimum, they argue, the limitation of extended benefits to hospitalized seamen was irrational.

### A. *Suspect Classification*

■ The Supreme Court has recognized only three suspect classifications that require strict scrutiny for purposes of constitutional review: race, *see, e.g., McLaughlin v. Florida,* 379 U.S. 184, 191–92, 85 S.Ct. 283, 287–89, 13 L.Ed.2d 222 (1964), nationality, *see, e.g., Oyama v. California,* 332 U.S. 633, 644–46, 68 S.Ct. 269, 274–75, 92 L.Ed. 249 (1948), and alienage, *see, e.g., Graham v. Richardson,* 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971). In addition, the Court at times has used an intermediate standard of review for gender-based classifications, *see, e.g., Craig v. Boren,* 429 U.S. 190, 204, 97 S.Ct. 451, 460, 50 L.Ed.2d 397 (1976), and occasionally an undefined, but heightened, review standard for classifications based on illegitimacy, *see* L. Tribe, *American Constitutional Law* § 16–23, at 1057 (1978). The Court has not recognized seamen as a suspect class for constitutional purposes.

The seamen call our attention to a line of cases defining seamen as "wards of admiralty," occupying a favored status with the courts. *See, e.g., Cortes v. Baltimore Insular Line,* 287 U.S. 367, 377, 53 S.Ct. 173, 176, 77 L.Ed. 368 (1932); *Harden v. Gordon,* 11 F.Cas. 480, 485 (C.C.D.Me.1823) (No. 6,047). Those cases, however, make clear that the seamen's "wardship" only requires the courts to construe ambiguous admiralty statutes and ancient admiralty law in a manner most favorable to the seamen. It has nothing to do with constitutional review where the intent of Congress is clear. *See, e.g., Isbrandtsen Co. v. Johnson,* 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952) ("Statutes which invade the common law or the general maritime law are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident."). We are aware of no decision that has invalidated a statute on constitutional grounds merely because seamen occupy a favored status with the courts. Nor are we persuaded that seamen have been subject to such pervasive discrimination as to justify carving out a new suspect classification.

### B. *Fundamental Right to Medical Care*

■ The seamen contend that strict scrutiny is warranted because the Budget Act deprives them of their fundamental right to medical care. Underlying this argument are the seamen's questionable assumptions that laches precludes relief for cure against the shipowners, and that the seamen have no access to medical treatment other than through the Public Health hospitals. The Budget Act on its face, however, does not alter the right of the seamen to seek cure from the shipowners, nor does it otherwise prohibit the seamen from access to private medical care. Medical care still is available to the plaintiffs, either through individual payments, private insurance policies or government-financed social programs such as Medicare or Medicaid. Even if relief against the owners is unavailable, the seamen are in no different position with regard to access to medical care than many other American citizens. Because the seamen have not been denied equal access to medical care, we need not decide whether equal access to medical care is a fundamental right subject to strict scrutiny for purposes of constitutional review.

### C. *Equal Protection Review of the Budget Act*

■ Social or economic legislation that does not impinge on fundamental rights or employ suspect classifications must be upheld against equal protection attack if the varying treatment of different groups or persons is rationally related to a legitimate governmental objective. *Hodel v. Indiana,* 452 U.S. 314, 331, 101 S.Ct. 2376, 2386, 69

L.Ed.2d 40 (1981). The legislation carries with it a presumption of rationality that can be overcome only by a clear showing of arbitrariness and irrationality. *Id.; see also Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 83, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595 (1978).

■ Even if we were to employ a heightened standard of review, however, we would find that the classification at issue is substantially related to an important government objective. Congress terminated the plaintiffs' subsidized medical care in a comprehensive budget reduction bill aimed at a variety of social and economic governmental programs. Congress has great power to determine how best to allocate limited public funds among potential recipients, so long as its actions are free from individious discrimination. *Cf. Dandridge v. Williams,* 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970) (power of state officials to allocate funds). Congress reasonably concluded that, in light of the availability of public and private hospitals, seamen no longer needed special governmental intervention to ensure the adequacy of their medical care. At the same time, the spread of sophisticated medical facilities has lessened the need for special governmental hospitals to protect the public from communicable diseases brought home by wide-ranging seafarers. *See* S.Rep. No. 139, 97th Cong., 1st Sess. 880–81 (1981), *reprinted in* 1981 U.S.Code Cong. & Ad.News 396, 903–04. Elimination of the government's expense of furnishing the seamen's free health care, therefore, was substantially related to the legitimate reduction of the budget.

D. *Extended Benefits for Hospitalized Seamen*

■ The seamen further contend that the Budget Act's extension of coverage for an additional year to seamen hospitalized prior to October 1, 1981, establishes an irrational classification in violation of equal protection. They note that many seamen were being treated as outpatients for ailments requiring more expensive or prolonged treatment than those suffered by certain seamen hospitalized prior to October 1. The Act makes no attempt to differentiate between seamen on the basis of either the seriousness of their medical condition or their ability to obtain alternate care.

The apparent purpose of the extension, however, was to ease the transition to private care for seamen with acute medical problems, and to provide a simple method of distinguishing those seamen from the rest. *See* H.R.Rep. No. 208, 97th Cong., 1st Sess. 811 (1981), U.S.Code Cong. & Admin.News p. 1173. The fact that some non-hospitalized seamen have serious chronic disorders does not make the classification irrational. Congress may adopt a classification in order to avoid the burden and expense of a case-by-case determination, even though the classification approximates, rather than mirrors, the result that a case-by-case determination would achieve. *Mathews v. Lucas,* 427 U.S. 495, 509, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651 (1976). The burden is on the plaintiffs to show the insubstantiality of the relationship between the classification and the result. *Id.* at 510, 96 S.Ct. at 2764. We hold that the extension of benefits to hospitalized seamen was not violative of equal protection.

**III. Due Process**

The seamen argue that the Budget Act denies due process by retrospectively terminating their "vested right" to care at government expense. Congress' retrospective termination of this right, they argue, should be subject to strict scrutiny.

■ Congress' gratuitous provision of free medical care did not give the seamen a "vested right" to the benefits immune from repeal. Property rights to public benefits are defined by the statutes or customs that create the benefits. *See, e.g., Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). When, as here, the statute author-

izing the benefits is amended or repealed, the property right disappears.

 Assuming arguendo, however, that termination of the plaintiffs' ongoing medical treatment actually is a retrospective denial of vested rights, the Supreme Court in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* — U.S. ——, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), recently defined the due process test for review of retroactive economic legislation: " 'The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process,' ... But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Id.* 104 S.Ct. at 2718 (citation omitted).

Congress might have concluded that permanently disabled seamen, like active seamen, had adequate rights against shipowners, personal resources, private medical insurance or access to other governmental programs that would substitute for free treatment in the Public Health hospitals. Although the facts of the instant case are not determinative of the reasonableness of Congress' conclusion, several of the plaintiffs' affidavits indicate they do in fact have additional medical coverage. Despite the plaintiffs' contention that it was unnecessary for Congress to terminate the disabled seamen's coverage because the savings were miniscule, it was not irrational for Congress to do so.

## IV. Taking Without Compensation

 The seamen argue that the Budget Act effects a taking without compensation of their contractual rights to cure and their fundamental right to medical care. This is essentially a recasting of the earlier arguments in terms of the fifth amendment's taking clause.

Like Social Security or railroad benefits, the hospital care provided for seamen by the government is a noncontractual benefit. In fact, unlike Social Security recipients, the seamen have not explicitly contributed a portion of their wages to finance the hospital care. It is clear that this program does not constitute "property" protected from governmental alteration or abolition. *See, e.g., U.S. Railroad Retirement Board v. Fritz,* 449 U.S. 166, 174, 101 S.Ct. 453, 459, 66 L.Ed.2d 368 (1980) ("There is no claim here that Congress has taken property in violation of the Fifth Amendment, since railroad benefits, like social security benefits, are not contractual and may be altered or even eliminated at any time."); *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 575, 99 S.Ct. 802, 805, 59 L.Ed.2d 1 (1979) ("Congress may alter, and even eliminate, [railroad benefits] at any time."); *see also Flemming v. Nestor,* 363 U.S. 603, 611, 80 S.Ct. 1367, 1372, 4 L.Ed.2d 1435 (1960) (Social Security benefits not property protected by due process clause).

## V. Contractual Claims Against the Government

Plaintiffs assert that they have contractual claims for maintenance and cure directly against the government under several theories: (1) the government operated or chartered certain vessels and therefore stands in the place of the owners, (2) the government's provision of free care resulted in a novation of the seamen's original employment contracts, substituting the government as the party responsible for the seamen's continued care, (3) the seamen are third party beneficiaries of a contract between the owners and the government, and (4) the seamen's reliance upon continued free medical care warrants an equitable remedy in quasi-contract.

### A. *Government-Operated Ships*

 Even if we assume that some of the plaintiffs have timely causes of action against the government for illnesses or injuries suffered in the service of government-operated vessels, they would not be entitled to invalidation of the Budget Act and reopening of the Public Health hospitals. At most they would be entitled only to the traditional forms of relief that would be available against other shipowners, as modified by the various statutes that define the limits of governmental liability in

such situations. We do not attempt in the instant case to determine the seamen's eligibility for or the parameters of such relief. The seamen's entitlement, if any, should be determined in individual suits against the government, not in a class action challenging the constitutionality of the Budget Act.

### B. *Novation of the Employment Contract*

 The seamen contend that the courts effected a partial novation of the seamen's employment contract. Courts traditionally have limited the seamen's recovery against the shipowners because of the free medical care available to seamen in the Public Health hospitals. *See Calmar Steamship Corp. v. Taylor*, 303 U.S. 525, 531, 58 S.Ct. 651, 654, 82 L.Ed. 993 (1938). This limitation, the seamen argue, resulted in the substitution of the government as the primary provider of medical care under the employment contract. As discussed above, and as the seamen concede, the primary obligation for maintenance and cure remains with the employer, and would revert back to it but for the alleged effect of laches.

This argument fails because, as we discussed above, laches is dependent on the facts of individual cases, and because none of the employers has been made a party to this action. Because laches does not operate as a matter of law, the seamen first must seek relief from the shipowners.

### C. *Third Party Beneficiary Contract*

 Under this theory, the government and the shipowners entered into a contract on the seamen's behalf. The government assumed the shipowners' duty to provide medical care for the seamen, in return for which the shipowners paid a tonnage tax and engaged in dangerous voyages beneficial to the nation's economy. As beneficiaries of this purported contract, the seamen claim the right of enforcement.

Although the tonnage tax originally financed the marine hospitals, they have been financed by general revenues since 1907. Act of Mar. 3, 1905, ch. 1484, 33 Stat. 1214, 1217 (1905). It is difficult to see how the tonnage tax in recent times could constitute a *quid pro quo* for medical services. In any event, the mere fact that Congress has levied a tax to finance medical care does not create in the beneficiaries a contractual right to the social benefits. Congress may change the level or amount of benefits, even when the benefit is directly financed by taxes upon the recipient's wages, as with Social Security. *See, e.g., Richardson v. Belcher*, 404 U.S. 78, 80, 92 S.Ct. 254, 256, 30 L.Ed.2d 231 (1971).

Congress also presumably undertakes every social program with an eye towards encouraging socially beneficial behavior. If compliance with Congress' encouragement were sufficient to create a contractual right to the benefits, Congress would retain little power to alter or abolish obsolete social programs, contrary to *Richardson*. We find no third party beneficiary contract for free medical services.

### D. *Quasi-Contract*

 The seamen contend that they have relied to their detriment on the government's promise of free medical care by undertaking dangerous seagoing careers and suffering illness or injury. At this late date, they argue, they can obtain neither private medical insurance nor relief against the shipowners. These circumstances allegedly warrant equitable relief against the government.

Central to this argument, however, is the questionable assumption that laches bars relief against the individual shipowners. If untrue, the seamen still have available the allowances for cure upon which they allegedly relied. Because the laches issue is undetermined, and may not be determined in this action as it affects individual shipowners, we believe the question of equitable relief is not yet ripe.

### CONCLUSION

We are not unmindful of the predicament of injured seamen who engaged in their

employment with the understanding that the government would provide free hospitalization and medical care. Congress, however, had the authority to terminate the program. Cogent arguments have been advanced that more generous provisions should have been enacted for the benefit of seamen disabled prior to the passage of the Act. The ultimate decision, however, is for the legislature, not the judiciary.

The district court's summary judgment is AFFIRMED.