John **PFEIFER, Personal Representative of the Estate of Sarah Pfeifer, on behalf of Sarah Pfeifer, Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, DIVISION OF PUBLIC ASSISTANCE, Appellee.**

No. S–13913.

Supreme Court of Alaska.

Sept. 23, 2011.

---

**22.** *Id.*

---

John W. Pfeifer, pro se, Kenai, Appellant.

Dario Borghesan, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

CARPENETI, Chief Justice.

## I. INTRODUCTION

An elderly woman requiring long-term medical care gave $120,000 to her son in February 2007. The mother believed that the gift would not prevent her from receiving Medicaid coverage if she lived long enough to exhaust her remaining assets. She relied on a provision in Alaska's Medicaid eligibility manual that suggested prospective Medicaid beneficiaries could give away a portion of their assets while retaining sufficient assets to pay for their medical care during the period of ineligibility that Medicaid imposes as a penalty for such gifts. But by the time the mother applied for Medicaid in September 2008, the Alaska legislature had enacted legislation with the retroactive effect of preventing the kind of estate planning the mother had attempted through her gift. The State temporarily denied the mother's appli-

cation. The son appeals pro se on behalf of his mother, who died in 2009.

We recognize the frustration that can result when the State provides information that leads to inaccurate expectations in a matter as inherently difficult and painful as planning for a dying parent's estate and end-of-life care. But the Alaska legislature's retroactive change to the Medicaid eligibility rules was valid. We thus affirm the State's temporary denial of the mother's application.

## II. FACTS, LEGISLATIVE HISTORY, AND PROCEEDINGS

### A. Facts And Legislative History.

On February 8, 2006, President George W. Bush signed the Deficit Reduction Act of 2005(DRA).[1] He stated that the bill "tightens the loopholes that allowed people to game the system by transferring assets to their children so they can qualify for Medicaid benefits."[2] Even before the enactment of the DRA, federal Medicaid law imposed a period of ineligibility on a person who transferred assets for less than fair market value before applying for benefits.[3] The penalty period lasted approximately for the number of months that the applicant could have paid for her own health care using the transferred assets if the transfer had not been made.[4]

But the law contained a provision allowing prospective Medicaid beneficiaries to engage in so-called "half-a-loaf" planning, according to which the prospective beneficiary "makes a gift of a portion of [her] assets while retaining sufficient assets to pay for [her] nursing home care during the period of ineligibility

---

1. Pub.L. No. 109–171, 120 Stat. 4 (2006).

2. Julia M. Hargraves, Note, *Financing Long-Term Care in Missouri: Limits and Changes in the Wake of the Deficit Reduction Act of 2005*, 73 Mo. L.Rev. 839, 846 (2008) (quoting Remarks on Signing the Deficit Reduction Act of 2005, Weekly Comp. Pres. Doc. 213, 214 (Feb. 8, 2006)).

3. 42 U.S.C. § 1396p(c) (2005) (amended 2006).

4. More precisely:
[T]he number of months of ineligibility under this subparagraph for an individual shall be equal to—

(I) the total, cumulative uncompensated value of all assets transferred by the individual (or individual's spouse) on or after the look-back date specified in subparagraph (B)(i), divided by
(II) the average monthly cost to a private patient of nursing facility services in the State (or, at the option of the State, in the community in which the individual is institutionalized) at the time of application.
42 U.S.C. § 1396p(c)(1)(E)(i) (2005) (amended 2006).

that results from the gifts."[5] Because the penalty period began running roughly at the time of the asset transfer,[6] prospective beneficiaries were able to "calculat[e] how long they would be ineligible for Medicaid benefits after a transfer and reserv[e] enough personal assets to pay for their care until the penalty period had run."[7]

The Deficit Reduction Act eliminated the possibility of this estate planning strategy by changing the start date for the asset transfer penalty period. The DRA states that for asset transfers made after February 8, 2006, the penalty period begins on

> the first day of a month during or after which assets have been transferred for less than fair market value, or the date on which the individual is eligible for medical assistance under the State plan and would otherwise be receiving institutional level care ... but for the application of the penalty period, whichever is later.[8]

This rule makes it practically impossible for a potential Medicaid beneficiary to cover her own medical expenses while waiting out the asset transfer penalty period: The period will not start until her remaining assets are gone.

On July 31, 2006, Alaska Governor Frank Murkowski signed House Bill (H.B.) 426, legislation that was intended to amend the Alaska Statutes to reflect the DRA's change to the penalty period start date.[9] The legislation added a subsection (m) to AS 47.07.020 that stated: "Except as provided in (g) of this section, the department shall impose a penalty period of ineligibility for the transfer of an asset for less than fair market value by an applicant or an applicant's spouse consistent with 42 U.S.C. 1396p(c)(1)."[10] Because 42 U.S.C. § 1396p(c)(1) codified the DRA's new asset transfer penalty period start date, AS 47.07.020(m) would have eliminated the possibility of a prospective beneficiary qualifying for Medicaid coverage by transferring some assets to a family member and then waiting out the penalty period using her remaining assets.

But the legislature stated that AS 47.07.020(m) would only become effective "July 1, 2006, or on the date of notification under sec. 13 of this Act of federal approval of a revised state plan for medical assistance coverage incorporating the changes made by secs. 1–7 and 9 of this Act, whichever is later."[11] This language proved problematic, because federal approval of the state plan did not arrive as anticipated in a single, all-encompassing gesture, with notification on a single date.[12] As a result, "there was a great deal of uncertainty about the effective date of the effective clauses."[13] In order to resolve any uncertainty, Senate Bill (S.B.) 259 would eventually be passed in 2008 to eliminate the conditional language in AS 47.07.020(m) and give it retroactive effect to October 1, 2006.[14]

While the preceding legislative changes took place through 2006, Sarah Pfeifer was living in Wichita, Kansas. Sarah was born in 1914. In 2005, her husband, Warren Pfeifer, was diagnosed with terminal cancer. He died in September 2006. After Warren's death, Sarah moved to Alaska, where her

---

5. Hargraves, *supra* note 2, at 841–42 & n. 17 (quoting Andrew H. Hook, *Durable Powers of Attorney: They Are Not Forms!*, 2000 Nat'l Acad of Elder Law Attorneys Symposium 26–1 n.42).

6. More specifically, the penalty period began "the first day of the first month during or after which assets have been transferred for less than fair market value." 42 U.S.C. § 1396p(c)(1)(D) (2005) (amended 2006).

7. Hargraves, *supra* note 2, at 841–42.

8. Pub.L. No. 109–171, § 6011, 120 Stat. 4, 61–62 (2006) (codified at 42 U.S.C. § 1396p(c)(1)(D)(ii) (2010)).

9. Ch. 96, SLA 2006.

10. Ch. 96, § 7, SLA 2006 (codified at AS 47.07.020(m)).

11. Ch. 96, § 16, SLA 2006 (repealed by ch. 39, § 3, SLA 2008).

12. *See generally* Minutes, Sen. Fin. Comm. Hearing on S.B. 259, 25th Leg., 2d Sess. (Mar. 24, 2008) (testimony of Karen Kurtz, Assistant Revisor, Legal Services).

13. *Id.*

14. *Id.;* ch. 39, § 2(a), SLA 2008 (codified at AS 47.07.020 ("Retroactivity")).

only son, John Pfeifer, lived with his wife.[15] According to John's testimony, his mother and father had said they wanted to give most of the proceeds of the sale of their house in Kansas to John and his wife as a gift. "[T]he money remaining in the bank account, my parents' bank account," John testified, "could be used to take care of my mom during the remaining months of her life."

But before making the gift, Sarah and John "wanted to make sure [they] were complying with all the applicable laws, especially those relating to Medicaid." John "didn't want to do anything that would jeopardize [his] mother's future medical care."

In November 2006, John met with an attorney specializing in "elder law and Medicaid eligibility." The attorney told John that his parents' contemplated gift of roughly half of their assets "should not cause a problem" under the state regulations then in effect. According to John, the attorney suggested that if the asset transfer led to a penalty under Medicaid, Sarah would still have enough money in her bank account to pay for her care until the penalty period ended and she became eligible for coverage.

In other words, the attorney advised John that half-a-loaf planning remained a viable estate planning strategy in Alaska. The attorney's advice was consistent with the most recent edition of the State's Aged, Disabled, and Long Term Care Medicaid Eligibility Manual (the Medicaid eligibility manual), released by the Division of Public Assistance (the Division). This manual was originally introduced in 2004 and has been updated on several occasions since then. Section 554 of the manual contains the rules governing the effect of asset transfers on Medicaid eligibility.

The most recent version of the Medicaid eligibility manual available in November 2006, when John first met with the attorney, was the October 2006 edition. Though the record does not contain a copy of section 554 from the October 2006 edition, it is uncontested that this version of section 554 continued to feature the pre–DRA asset transfer penalty start date, according to which "[t]he penalty period begins the month after the ... transfer" of assets. Thus the Medicaid eligibility manual continued to suggest in November 2006 that half-a-loaf planning remained viable in Alaska, despite the passage of the DRA and AS 47.07.020(m). The manual would not be revised to reflect the DRA's prevention of the half-a-loaf planning strategy until July 2007.[16]

On February 27, 2007, the day that Sarah's house in Kansas sold, John spoke again with the attorney and confirmed that the relevant rules had not changed since their last consultation in November 2006. Sarah then signed a letter formalizing the transfer of $120,000 to John and his wife. The parties agree that for legal purposes, the transfer took place on February 27.[17]

In July 2007, after Sarah's gift and before her application for Medicaid, Alaska changed its regulations in a way that reflected the new penalty start date in the DRA. Before this time, the main regulation dealing with asset transfer penalties, 7 Alaska Administrative Code (AAC) 40.295, only laid out the length of the penalty period, and was silent

---

**15.** We refer to appellant throughout this opinion as "John," with the understanding that John appears on behalf of his late mother, Sarah Pfeifer.

**16.** On the other hand, the State argued that "the agency began informing attorneys offering trust services in November of 2006 [that] changes to the Medicaid waiver program were being reviewed and most especially the transfer of asset category. Attorneys were advised to not recommend any transfers until regulations and the effects were clearly outlined." A CLE presentation cited by John supports the State's contention. *See* Andy Harrington, *Medicaid and Long–Term Care: Legislative Changes in the Deficit Reduction Act and related State Legislation (PPT),* *in* Medicaid & Estate Planning: Issues & Strategies 1, 15–22 (Alaska Bar Assoc. ed., 2007), *available at* https://www.alaskabar.org./servlet/download?id=152. Harrington's presentation states that the effective date for the post–DRA changes is "[u]nfortunately, not entirely clear." *Id.* at 16. Harrington notes that "[t]he Centers for Medicare and Medicaid Services (CMS) may read the DRA as requiring the State to try to apply the changes retrospectively to Feb. 8, 2006, with respect to ... [t]he starting point of the penalty period." *Id.* at 17.

**17.** Technically, it was not until February 28 that John made out the check to himself from an account in both his and Sarah's names.

regarding the penalty period's start date.[18] Effective July 20, 2007, a new regulation at 7 AAC 100.510(g) provided:

The penalty period [for a transfer of an asset for less than fair market value that occurs on or after February 8, 2006] begins on the first day of the following month, whichever is later:

(1) the month immediately after the month the transfer occurred;

(2) the month that the department determines the recipient is eligible to receive long-term care services.

Also in July 2007, the Division released a revised version of its Medicaid eligibility manual that for the first time contained the post–DRA penalty start date.

Finally, as noted above, in May 2008 the Alaska legislature passed S.B. 259, revising AS 47.07.020(m) to make it retroactive to October 1, 2006.[19]

On August 19, 2008, Sarah, through John, applied for Medicaid long-term care services. She had been living by then for over a year in a nursing home in Soldotna. The Division temporarily denied her application after concluding that the $120,000 gift triggered a "transfer of asset penalty" that began on September 1, 2008 and prevented her application from being granted prior to July 15, 2009. The Division's decision cited no law other than stating that it is supported by "Medicaid Manual Section 554," apparently a reference to the July 2007 Medicaid eligibility manual discussed above.

### B. Proceedings.

John promptly filed a "fair hearing" request on Sarah's behalf to contest the denial of her application.[20] The request stated that

John disagreed with the Division's application of the transfer of asset penalty period.

Before the fair hearing, a representative of the Division presented a brief position statement arguing that section 554 of the Medicaid eligibility manual and the Alaska Administrative Code supported the Division's denial of the application. The Division submitted a copy of section 554 of the Medicaid eligibility manual from July 2007 stating that "[f]or asset transfers made on or after February 8, 2006, the penalty begins the month the individual is eligible for Medicaid and would be receiving institutional level of care services, except for the imposition of a transfer of asset penalty." This language from the July 2007 manual was apparently the language relied on by the Division in denying Sarah's application in 2008. The Division also submitted an undated version of 7 AAC 100.510 stating in section (g) that the penalty period "begins on the first day of the following month, whichever is later: (1) the month immediately after the month the transfer occurred; (2) the month that the department determines the recipient is eligible to receive long-term care services." As noted above, this version of 7 AAC 100.510 came into effect on July 20, 2007.

At the fair hearing, the Division's representative briefly summarized the Division's position. The remainder of the hearing was largely dedicated to John's presentation of arguments on Sarah's behalf. He stated that "the argument we're making is primarily legal" and noted no factual disputes between the parties. John emphasized that he was not taking issue with the imposition of a penalty period, but with the Division's calculation of the period's start date. He argued that based on the version of the Medicaid eligibility manual in effect at the time of the

---

**18.** 7 AAC 40.295(d) (2006), which has remained unamended through the present day, states:

The division will establish the period for which assistance is denied [based on a voluntary assignment or transfer of a resource in order to qualify for assistance] by determining the uncompensated value of the resource disposed of and dividing that amount by the amount of maximum monthly assistance payable under 7 AAC 40.370(c). The resulting quotient, rounded, in case of a fraction, to the nearest whole number, represents the number of months for

which the applicant is ineligible for assistance, up to a maximum of 36 months.

**19.** Ch. 39, § 2(a), SLA 2008.

**20.** Federal Medicaid law requires "granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3) (2008).

gift, Sarah's period of ineligibility should have begun March 1, 2007, the first day of the month after she transferred the assets to her son, not September 1, 2008, as the Division concluded based on the July 2007 version of the manual. If the March 1, 2007 starting date had been applied, Sarah's ten-and-a-half-month penalty period would have ended in January 2008, long before she applied for Medicaid in August 2008. John also advanced state constitutional arguments on his mother's behalf.

The hearing officer ruled in favor of the Division. He concluded that he lacked jurisdiction to adjudicate John's constitutional arguments. The premises of his decision were that there were no disputed issues of material fact, that the sole issue for determination was the start date of Sarah's penalty period, and that the Division based its decision on 7 AAC 100.510(g). The hearing officer noted that AS 44.62.240 states that "legislative" regulations (as opposed to "interpretive" ones) have "prospective effect only." [21] Reasoning that .510 is a "legislative" rather than an "interpretive" regulation, the hearing officer concluded that .510 must be prospective only. It "can properly be applied only to asset transfers occurring after its effective date of July 20, 2007," even though the regulation states that it applies to asset transfers "on or after February 8, 2006." [22] Thus, "the Division erred by retroactively applying 7 AAC 100.510(g) to calculate the penalty period start date" for Sarah's application.

Nevertheless, the hearing officer upheld the Division's application of a September 1, 2008 penalty start date. The hearing officer reasoned that in the absence of a valid state regulation establishing a penalty start date, the start date contained in the federal Medicaid statute at 42 U.S.C. § 1396p, effective for gifts made after February 8, 2006, "applies by default." Because this start date is functionally identical to the one in 7 AAC 100.510(g), the Division's calculations were correct, and Sarah's penalty period began on September 1, 2008.

John appealed the fair hearing decision to the director of the Division. In his appeal, John agreed that 7 AAC 100.510 is invalid, but argued that there was no need to look to federal law, because 7 AAC 40.295 gave the Division authority to establish a penalty start date on its own, and the Division did so through its Medicaid eligibility manual. He also repeated his argument that the Division should be equitably estopped from imposing a penalty start date different than the one contained in the edition of the manual available at the time of Sarah's gift.

The director upheld the fair hearing decision, concluding that the hearing officer "correctly interpreted the applicable federal law . . . when making its decision." The director noted that the fair hearing decision was also supported by "[s]tate law existing at the time of the asset transfer," specifically AS 47.07.020, which as noted above was amended on July 31, 2006, to state: "Except as provided in (g) of this section, the department shall impose a penalty period of ineligibility for the transfer of an asset for less than fair market value by an applicant or an applicant's spouse consistent with 42 U.S.C. 1396p(c)(1)." [23] While John's appeal indicated "there was some confusion as to the effective date of this section," this issue was resolved on May 22, 2008, with the passage of S.B. 259, which clearly established an effective date for AS 47.07.020(m) of October 1, 2006.

John appealed the director's decision to the superior court. The superior court affirmed the Division's decision, concluding that under the Supremacy Clause of the U.S. Constitution, 42 U.S.C. § 1396p(c) preempted any conflicting penalty start date in state law. The superior court also rejected John's

---

**21.** AS 44.62.240 reads in its entirety:

If a regulation adopted by an agency under this chapter is primarily legislative, the regulation has prospective effect only. A regulation adopted under this chapter that is primarily an "interpretative regulation" has retroactive effect only if the agency adopting it has adopted no earlier inconsistent regulation and has followed no earlier course of conduct inconsistent with the regulation. Silence or failure to follow any course of conduct is considered earlier inconsistent conduct.

**22.** 7 AAC 100.510(e) (2007).

**23.** AS 47.07.020(m) (2006).

equitable estoppel, due process, and equal protection arguments. Finally, the superior court rejected John's argument that the Division's retroactive application of federal law and AS 47.07.020(m) constituted an unconstitutional ex post facto law under article I, § 15 of the Alaska Constitution.

John appeals the superior court's affirmation of the Division's decision.

## III. STANDARD OF REVIEW

■ "In an appeal from a judgment of a superior court acting as an intermediate court of appeal, we independently review the agency decision, giving no deference to the superior court decision." [24]

■ The parties agree that all issues on appeal in this case concern questions of law that do not involve agency expertise. "On questions ... such as these, we substitute our judgment for that of the administrative agency, reviewing the legal issues de novo." [25] "In substituting our judgment for that of the agency, we have a duty to 'adopt the rule of law that is most persuasive in light of precedent, reason, and policy.'" [26]

## IV. DISCUSSION

### A. Because AS 47.07.020(m) Is A Valid Retroactive Statute, We Affirm The Division's Temporary Denial Of Benefits.

■ As noted in the legislative history above, AS 47.07.020(m) states that "the de-

partment shall impose a penalty period of ineligibility for the transfer of an asset for less than fair market value by an applicant or an applicant's spouse consistent with 42 U.S.C. 1396p(c)(1)." The latter federal statute consists of a rule concerning the start date for asset transfer penalty periods.[27] This rule would establish September 1, 2008, as the penalty start date for Sarah's gift, just as the Division concluded in its temporary denial of her application for Medicaid.

When AS 47.07.020(m) was originally signed in July 2006, it was accompanied by a problematic conditional effective date based on the assumption that the federal government would approve Alaska's revised Medicaid plan in its entirety on a single occasion.[28] This never came to pass. In May 2008, the legislature passed S.B. 259, which repealed the conditional effective date and replaced it with a retroactive effective date of October 1, 2006.[29] This retroactive effective date preceded Sarah's February 2007 transfer of assets, and the passage into law of S.B. 259 preceded her September 2008 application for Medicaid. The State argues that the Division "correctly applied 47.07.020(m)" to this case.[30] We agree.

Alaska Statute 01.10.090 states: "No statute is retrospective unless expressly declared therein." We have explained "retroactivity" as follows:

> A statute will be considered retroactive insofar as it gives to pre-enactment conduct a different legal effect from that

**24.** *Allen v. State, Dep't of Health & Soc. Servs., Div. of Pub. Assistance,* 203 P.3d 1155, 1160 (Alaska 2009) (citing *Cook Inlet Pipe Line Co. v. Alaska Pub. Utils. Comm'n,* 836 P.2d 343, 348 (Alaska 1992)).

**25.** *Id.* (citing *Lopez v. Adm'r, Pub. Emps. Ret. Sys.,* 20 P.3d 568, 570 (Alaska 2001)).

**26.** *Id.* (citing *Cook Inlet,* 836 P.2d at 348).

**27.** *See supra* text accompanying note 4 (quoting 42 U.S.C. § 1396p(c)(1) at length).

**28.** *See* ch. 96, § 16, SLA 2006 (making AS 47.07.020(m) and other provisions effective "July 1, 2006, or on the date of notification under sec. 13 of this Act of federal approval of a revised state plan ..., whichever is later"); ch. 96, § 13, SLA 2006 (requiring DHSS to apply for federal

approval of "*a* revised state plan" and report "*the* federal approval of *the* revised state plan," (emphases added) implying a single plan and a single approval).

**29.** Ch. 39, §§ 2–3, SLA 2008 (making AS 47.07.020(m) retroactive to October 2006, and repealing ch. 96, § 16, SLA 2006).

**30.** As discussed above, there is no indication in the record that the Division's temporary denial of Sarah's application was based on AS 47.07.020(m). But the Division's director noted in her decision upholding the temporary denial that AS 47.07.020(m) provided support. Furthermore, we "may affirm the agency's decision on any ground supported by the record." *Rubey v. Alaska Comm'n on Postsecondary Educ.,* 217 P.3d 413, 415 (Alaska 2009) (citing *Benavides v. State,* 151 P.3d 332, 334 (Alaska 2006)).

which it would have had without passage of the statute. A statute creates this different legal effect if it would impair rights a party had when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.[31]

John acknowledges that AS 01.10.090 allows statutes to have retroactive effect if they expressly declare their retroactivity, as is the case with the post-May 2008 version of AS 47.07.020(m).[32] But he argues that the retroactive application of AS 47.07.020(m) to Sarah's asset transfer would constitute "an unlawful taking" and be "an unconstitutional ex post facto law under the Alaska and U.S. Constitutions."

On the first point, John specifically argues that the retroactive application of AS 47.07.020(m) to his mother's gift would violate the takings clauses of the Alaska and U.S. Constitutions. Article I, section 18 of the Alaska Constitution states: "Private property shall not be taken or damaged for public use without just compensation." The Fifth Amendment to the U.S. Constitution similarly provides that private property shall not "be taken for public use, without just compensation."[33]

We address two initial questions in determining whether an unconstitutional taking has occurred: (1) whether the claimant has a property interest protected by the takings clause; and (2) if so, whether the government action in question effected a taking of that property without just compensation.[34] John's argument fails based on the first prong. In order to determine whether a claimant has a property interest protected by the takings clause, we examine whether the claimant's right or property interest has "vested."[35] Because Sarah had not applied for or been granted Medicaid benefits prior to the retroactivity amendment in May 2008, any interest she had in such benefits had not vested prior to May 2008.[36] Thus the retroactivity amendment affecting AS 47.07.020(m) could not have constituted a taking.

Our decision in *Underwood v. State*[37] provides a close precedent. There, we considered the constitutional claims of a family that timed its move to Alaska in reliance on eligibility rules for the Permanent Fund Dividend (PFD) that the legislature changed after the family's arrival, rendering the family ineligible for the 1993 PFD.[38] We held that because the family "possessed nothing more than an inchoate expectancy of a 1993 PFD that is

---

**31.** *Rush v. State, Dep't of Natural Res.*, 98 P.3d 551, 555 (Alaska 2004) (internal quotation marks, brackets, and footnotes omitted); *see also State, Dep't of Natural Res. v. Alaska Riverways, Inc.*, 232 P.3d 1203, 1218 (Alaska 2010); *Norton v. Alcoholic Beverage Control Bd.*, 695 P.2d 1090, 1093 (Alaska 1985) ("[R]etrospective legislation is not in and of itself unconstitutional.").

Alaska Const. art. II, § 18 states: "Laws passed by the legislature become effective ninety days after enactment. The legislature may, by concurrence of two-thirds of the membership of each house, provide for another effective date." Neither party raises the issue of whether this provision applies to an amendment making a statute retroactive, as in the May 2008 amendment to AS 47.07.020. But over two-thirds of each house concurred in the passage of S.B. 259. *See* 2008 Senate Journal 2412 (recording 19 yeas, 0 nays, 1 excused, 0 absent for S.B. 259); 2008 House Journal 2931 (recording 36 yeas, 0 nays, 2 excused, 2 absent).

**32.** Ch. 39, § 2, SLA 2008 ("RETROACTIVITY.(a) ... AS 47.07.020 ... (m) ... [is] retroactive to October 1, 2006.").

**33.** *See State, Dep't of Natural Res. v. Arctic Slope Reg'l Corp.*, 834 P.2d 134, 137–38 (Alaska 1991)

(noting similarity between state and federal takings clauses and adopting approach of U.S. Supreme Court in *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)).

**34.** *See Hageland Aviation Servs., Inc. v. Harms*, 210 P.3d 444, 449 (Alaska 2009) (citing *Arctic Slope*, 834 P.2d at 138).

**35.** *Id.; Underwood v. State*, 881 P.2d 322, 327 (Alaska 1994) (citing *Norton*, 695 P.2d at 1092).

**36.** *See Jones v. Reagan*, 748 F.2d 1331, 1338–39 (9th Cir.1984) (stating that noncontractual government benefits such as hospital care provided to seamen clearly do "not constitute 'property' protected from governmental alteration or abolition" (citing *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 174, 101 S.Ct. 453, 459, 66 L.Ed.2d 368 (1980))).

**37.** 881 P.2d 322.

**38.** *Id.* at 323–24.

not afforded constitutional protection," [39] the family "had no property right whatsoever in a 1993 PFD," [40] and thus "they had no property that could have been the subject of a taking in violation of the Fifth Amendment of the Federal Constitution and Article I, section 18 of the Alaska Constitution." [41]

Similarly, when Sarah made her gift to John in February 2007, she had nothing more than an inchoate expectancy of eventually being eligible for Medicaid benefits based on her estate planning strategy. She had no vested right in receiving such benefits by virtue of that strategy. Thus she had no property that could have formed the subject of a taking in violation of either the Alaska or U.S. Constitutions.[42]

John defends Sarah's claim by arguing that the "taking" in question was not the taking of her Medicaid benefits, but the taking of her "vested right to dispose of her property as she sees fit." This argument conflicts with the uncontested facts of the case. The government did not confiscate Sarah's $120,000 gift to John. It is not the case that the State of Alaska "revoked a monetary gift" or "revoked a completed transaction" when it temporarily denied Sarah's application. The State simply refused to grant her low-income medical assistance so long as a close family member controlled assets that had been hers a short while before and would have been sufficient to pay for her care.

■ John's second constitutional argument against the retroactive application of AS 47.07.020(m) to Sarah's Medicaid application is that such an application violates the prohibition against ex post facto laws in article I, section 15 of the Alaska Constitution. But the prohibition against ex post facto laws concerns the retroactive application of penal statutes,[43] and is thus unrelated to the facts of this case.

Finally, John introduces several arguments on appeal that we deem waived. He argues in his reply brief that AS 47.07.020(m) is not controlling because "it is merely enabling legislation," and implies that it cannot withstand a "fairness and reasonableness" review. The former argument is briefed in cursory fashion without citation to legal authority,[44] the latter argument is little more than implied, and both arguments are intro-

---

**39.** *Id.* at 327 (citing *Norton,* 695 P.2d at 1092 n. 4) (property rights must be vested to receive due process protection against state action under the Alaska and U.S. Constitutions); *Bidwell v. Scheele,* 355 P.2d 584, 586 (Alaska 1960) (same).

**40.** *Id.*

**41.** *Id.* at 327 n. 5.

**42.** John analogizes the present case to *A. Gallo & Co. v. McCarthy,* 51 Conn.Supp. 425, 2 A.3d 56 (Conn.Super.Ct.2010), where the Connecticut Superior Court struck down as an unconstitutional taking a retroactive portion of a bill that required bottle distributors to return to the state unclaimed refund money from special accounts established by the state. *Id.* at 447–51, 2 A.3d 56. But *Gallo* is easily distinguished from the present case, and from *Underwood.* In *Gallo,* the state attempted through retroactive legislation to recover monies that it had already paid out. *Id.* In the present case and *Underwood,* by contrast, no money had been paid prior to the enactment of the retroactive legislation. *See Underwood,* 881 P.2d at 323–24. Sarah could not have had a vested property right in a merely anticipated benefit.

**43.** *See Doe v. State,* 189 P.3d 999, 1003 (Alaska 2008) (noting that Alaska and U.S. constitutional prohibitions on ex post facto laws apply only to penal statutes). Ex post facto prohibitions

> bar the legislature from enacting any law that "punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission; or which deprives one charged with a crime of any defense available according to law at the time when the act was committed."

*Id.* (quoting *State v. Anthony,* 816 P.2d 1377, 1378 (Alaska 1991)).

**44.** *See A.H. v. W.P.,* 896 P.2d 240, 243 (Alaska 1995) (concluding that claims by a pro se appellant may be waived due to cursory briefing (citing *Adamson v. Univ. of Alaska,* 819 P.2d 886, 889 n. 3 (Alaska 1991))). Even if John's argument were not waived, we note that AS 47.07.020(m) is accompanied by no language indicating that it would not be effective in the absence of enabling legislation. John points to testimony before the House Finance Committee in support of this theory, but the testimony only establishes that the Division expected it would not be able to obtain the full fiscal benefits of H.B. 426 as a whole until after regulations were adopted, not that AS 47.07.020(m) required the adoption of regulations in order to become legally effective.

duced for the first time in John's reply brief. As such, they are waived.[45]

### B. The Superior Court Correctly Held That The Division Was Not Equitably Estopped From Temporarily Denying Sarah Pfeifer's Application.

John argues that the Division should be equitably estopped from temporarily denying Sarah's application based on her asset transfer, because the Division's most recent Medicaid eligibility manual before the transfer indicated that the penalty period for the transfer should have expired by the time of her application for Medicaid. The State counters that granting equitable estoppel would force the State to contravene federal law, and thus that estoppel should not be granted. The State also argues that John cannot satisfy the four elements of equitable estoppel.

We have said:

Equitable estoppel applies against the government in favor of a private party if four elements are present in a case: (1) the governmental body asserts a position by conduct or words; (2) the private party acts in reasonable reliance thereon; (3) the private party suffers resulting prejudice; and (4) the estoppel serves the interest of justice so as to limit public injury.[46]

We do not need to decide whether Sarah's reliance on the Medicaid eligibility manual in February 2007 was reasonable in light of the DRA's requirement—in effect since February 2006—that states adopt the new penalty period start date. In any event, granting estoppel in this case would not serve the interest of justice. John asks us to estop the State from applying to Sarah the termination of a policy that allowed higher-income Alaskans to benefit from a program intended to provide needed medical care to low-income Alaskans. Equity does not demand such a result. The State must have the flexibility to apportion its resources to those who are most in need, even when doing so deprives others of an expected benefit that had not yet vested. We sympathize with the frustration that results whenever the State provides informational materials that lead to inaccurate expectations, as happened in this case. But we will not second-guess the equities of the legislature's policy decision to apply AS 47.07.020(m) retroactively to October 1, 2006.

### C. The Superior Court Correctly Held That The State Did Not Violate Sarah Pfeifer's Equal Protection Or Due Process Rights By Temporarily Denying Her Application.

John argues that the application of the post–DRA penalty period start date to his mother's application violated the equal protection clause of the Alaska Constitution.[47] His argument is based on the premise that someone who engaged in an asset transfer and applied for Medicaid benefits before August 1, 2007, would be treated differently than someone who applied after that date. Even if it is assumed for the sake of argument that the Division did not start applying the post–DRA penalty start date until after August 1, 2007, and even if John's

---

**45.** *See Diaz v. State, Dep't of Corr.*, 239 P.3d 723, 730 n. 30 (Alaska 2010) (issues raised for first time in reply brief deemed waived (citing *Maines v. Kenworth Alaska, Inc.*, 155 P.3d 318, 326 (Alaska 2007))). Another issue introduced for the first time in John's reply brief, and thus waived, is John's argument that the May 2008 retroactivity amendment to AS 47.07.020 is "illegal" and "in violation of AS 01.10.090" because it is "not permitted" for "curative acts" such as the May 2008 amendment to also make "substantive changes" to a bill. Even if this argument were not waived, we note that there is no legal prohibition on the enactment of legislation that both (1) cures a defect in prior legislation through a retroactive provision and (2) substantively alters the prior legislation. Similarly, we note that there is no legal authority for John's suggestion that a bill passed "as a revisor's bill under the authority" of AS 01.05.036 may not also make substantive changes to a prior statute. AS 01.05.036 describes the process of developing "for submission to the legislature legislation for the correction or removal of the deficiencies, conflicts, or obsolete provisions, or to otherwise improve the form *or substance* of any portion of the statute law of this state." (Emphasis added.)

**46.** *Allen v. State, Dep't of Health & Soc. Servs., Div. of Pub. Assistance*, 203 P.3d 1155, 1164 (Alaska 2009) (citing *Crum v. Stalnaker*, 936 P.2d 1254, 1256 (Alaska 1997); *Municipality of Anchorage v. Schneider*, 685 P.2d 94, 97 (Alaska 1984)).

**47.** Alaska Const. art. I, § 1.

clarification that he is not making a "selective enforcement" argument is accepted, John's equal protection argument does not succeed.

Article I, section 1 of the Alaska Constitution provides that all persons are "entitled to equal rights, opportunities, and protection under the law." As we recently explained, in a case involving equal protection:

> Under the Alaska Constitution, the "legitimate reason test" is the standard level of scrutiny ... in equal protection cases, and we apply it to laws that do not employ classifications based on suspect factors or infringe on fundamental rights. Under this test, a law will survive as long as a legitimate reason for the disparate treatment exists and the law creating the classification bears a fair and substantial relationship to that reason.[48]

The Division's choice of an effective date will thus survive this analysis if it bore a rational relationship to a legitimate objective.[49]

The crux of John's argument is that the August 1, 2007 effective date for the retroactive application of the new penalty start date is "arbitrar[y]," and thus bears no fair and substantial relationship to any legitimate reason for disparate treatment. But there will often be a degree of arbitrariness in the setting of effective dates for new policies, and this line-drawing will often result in otherwise similarly situated individuals being treated differently based on their relation to the more or less arbitrary dividing line.[50] This does not mean that the policies are unconstitutional, or that every state agency must refrain from enacting new policies until some special date having a natural or necessary relation to the policy can be identified. The Division's choice of August 1, 2007, as the effective date for the new rule—assuming for the sake of argument, as noted above, that such a choice was made—withstands John's equal protection challenge: The chosen date has a rational relation to the government's goal in implementing the post–DRA penalty start date as soon as practicably possible.

■ John also argues that the temporary denial of Sarah's Medicaid application violated her procedural and substantive due process rights under both the Alaska and U.S. Constitutions. His arguments here also do not succeed.

■ "For a law to violate substantive due process, it must have 'no reasonable relationship to a legitimate governmental purpose.'"[51] Because the temporary denial of Sarah's Medicaid application did not violate equal protection for the reasons stated above, and because "a statute that meets the higher equal protection standard will always satisfy the demands of substantive due process," the temporary denial of Sarah's application did not violate substantive due process.[52]

With regard to procedural due process, John states that Sarah's argument "is not about the fair hearing process, it is about a lack of notice and opportunity to be heard before [the Division] deprived her of an im-

---

48. *Griswold v. City of Homer*, 252 P.3d 1020, 1030 (Alaska 2011) (footnotes and some internal quotation marks omitted).

49. *Id.* at 1030 (citing *Glover v. State, Dep't of Transp., Alaska Marine Highway Sys.*, 175 P.3d 1240, 1257 (Alaska 2008)).

50. The U.S. Supreme Court has stated in the context of the federal equal protection clause:

In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.

*Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (citations and internal quotation marks omitted); *see also Black v. Sec'y of Dep't of Health & Human Servs.*, 33 Fed.Cl. 546, 555 (Fed.Cl.1995) (upholding against equal protection challenge a cut-off for participation in a government program, where the cut-off was "no more arbitrary than most statutes of limitations").

51. *Schiel v. Union Oil Co. of Cal.*, 219 P.3d 1025, 1036 (Alaska 2009) (quoting *Premera Blue Cross v. State, Dep't of Commerce, Comty. & Econ. Dev., Div. of Ins.*, 171 P.3d 1110, 1124 (Alaska 2007)).

52. *Id.* at 1036 n. 70 (summarizing *Premera*, 171 P.3d at 1124–25).

portant property right to give a gift." Procedural due process "requires that benefit recipients be given timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend before their benefits are reduced or terminated, in order to afford them protection from agency error and arbitrariness." [53] Because Sarah received notice and an opportunity to be heard through the fair hearing process, we reject John's procedural due process claim.

### D. We Decline To Reach The Issue Of Preemption.

Finally, because we find no constitutional or other infirmity in the retroactive application of AS 47.07.020(m) to Sarah's gift, it is unnecessary for us to reach the question of preemption addressed by the superior court. Whether or not the DRA would have preempted a conflicting state law, no preemption exists in this case because there is no conflict between federal and state law: The asset transfer penalty rule applied in the denial of Sarah's application was precisely the asset transfer penalty rule contained in the DRA.[54]

### V. CONCLUSION

Because the Alaska legislature's retroactive change to the Medicaid eligibility rules was valid, because the State was not equitably estopped from applying those rules, and because their application did not violate Sarah Pfeifer's constitutional rights, we AFFIRM the superior court's upholding of the State's temporary denial of her Medicaid application.

---

**53.** *Heitz v. State, Dep't of Health & Soc. Servs.,* 215 P.3d 302, 306 (Alaska 2009) (quoting *Allen v. State, Dep't of Health & Soc. Servs., Div. of Pub. Assistance,* 203 P.3d 1155, 1167 (Alaska 2009)) (internal quotation marks omitted).

**54.** *See* AS 47.07.020(m) (incorporating by reference 42 U.S.C. § 1396p(c)(1)).